David B. Shanies
DAVID B. SHANIES LAW OFFICE
411 Lafayette Street, Sixth Floor
New York, New York 10003
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STANLEY STEPHENS,<br><br>                    Plaintiff,<br><br>    — against —<br><br>ANDREW C. BRUNSDEN, KATERINA V. KURTEVA, PETER RELYEA, LESLEY A. BROVNER, MICHAEL CARROLL, SUSAN T. LAMBIASE, MARK G. PETERS, MICHEL P. SPANAKOS, SARA A. WALSHE, THE CITY OF NEW YORK, and SHELLEY R. SOLOMON,<br><br>                    Defendants. | Case No. 17-CV-1153<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Stanley Stephens files this Complaint against the above-captioned Defendants and alleges as follows:

## NATURE OF THE ACTION

1.      Mr. Stephens brings this action under 42 U.S.C. § 1983 and New York State Law to recover damages relating to his false arrest and imprisonment on April 13, 2016.

2.      Mr. Stephens is a 24 year-old African-American man who has devoted the majority of his working life to helping children, and at-risk youth in particular.  Prior to the events underlying this case, Mr. Stephens had no history with the criminal justice system.

3.      In the spring of 2016, the individual Defendants – employees of the New York City Department of Investigation ("DOI") and Kings County District Attorney's Office

("KCDA") – caused Mr. Stephens to be arrested and deprived of his liberty, maliciously and in the absence of probable cause.

4.     The arrest charges against Mr. Stephens related to his work for a non-profit organization focusing on juvenile offenders in New York City.

5.     Defendants accused Mr. Stephens of falsifying entries in a log book used to document the status of the youth under his supervision.  Those allegations were untrue.

6.     Defendants' actions came at the end of a nearly yearlong investigation by the DOI and KCDA into the "Close To Home" residential program for youthful offenders in New York City, a program overseen by the New York City Administration for Children's Services ("ACS").

7.     Defendants began investigating "Close To Home" after three boys in the program escaped from a residence in Brooklyn, traveled into Manhattan, and sexually assaulted and robbed a young woman – a terrible crime that gained widespread media attention.

8.     Those horrific events had nothing whatsoever to do with Mr. Stephens.

9.     Mr. Stephens did not work in the residence where the offending boys lived, nor was he present when they escaped.  Indeed, no one ever escaped on Mr. Stephens' watch.

10.     As the City investigated the program, the individual Defendants came under intense pressure to hold someone responsible for this tragedy.

11.     Ultimately, these Defendants became determined to send a message and quell the public outcry over the apparent failures of the "Close To Home" program by making arrests.

12.     Probable cause for those arrests, however, did not exist.

13.     Defendants selected for arrest four African-American former staff members who worked on the "Close To Home" program, including Mr. Stephens.

14.     Defendants intentionally publicized Mr. Stephens' arrest, causing the false allegations against Mr. Stephens to receive local, national, and international media attention, and falsely and maliciously implying a connection between Mr. Stephens and a horrendous 2015 crime that had nothing to do with him.

15.     Defendants knew that the cases against these three young men and one woman would not be prosecuted; however, Defendants coveted the appearance of toughness and action that they believed the making of arrests and filing of criminal charges would bring.

16.     Defendants caused Mr. Stephens to be arrested on three counts each of Offering a False Instrument for Filing in the Second Degree and Falsifying Business Records in the Second Degree, crimes defined by Sections 175.30 and 175.05 of the New York Penal Law, respectively.

17.     Defendants knew, or were reckless as (and/or deliberately indifferent) to the fact that, probable cause did not exist for Mr. Stephens' arrest.

18.     The elements of Offering a False Instrument for Filing include: (a) the document at issue contained a false statement; (b) the defendant knew it contained a false statement; (c) the defendant offered or presented the document to a public office or public servant, and (d) the defendant knew the document would become a part of the records of a public authority.

19.     Where there is no evidence to support one or more of the required elements of that crime, there is no probable cause to arrest someone for the offense.  That was the case here.

20.     Here, probable cause was lacking for the Offering a False Instrument charges for reasons that included: (a) the documents at issue did not contain a false statement, (b) Mr. Stephens never "offer[ed] or present[ed]" the documents at issue to "a public office or public servant," and (c) Mr. Stephens never had "knowledge or belief" that the documents at issue would become "a part of the records" of a public authority.

21.     There was and is no evidence of any of the foregoing elements of the crimes alleged.

22.     The elements of Falsifying Business Records include: (a) the defendant made a false entry in the records of an enterprise, and (b) the defendant had intent to defraud.

23.     In this case, probable cause was lacking for the Falsifying Business Records charges for reasons that included: (a) Mr. Stephens never made a "false entry" in the business records of an enterprise, and (b) Mr. Stephens had no "intent to defraud."

24.     There was and is no evidence of either of the foregoing elements of the crimes alleged.

25.     The criminal charges were all disposed of at Mr. Stephens' first post-arraignment court appearance, through an unconditional Adjournment in Contemplation of Dismissal pursuant to New York Criminal Procedure Law § 170.  The charges were dismissed in their entirety in December 2016 – but not before great damage had been done to Mr. Stephens.

26.     The DOI Defendants' acts and omissions were motivated by improper purposes, including creating what they viewed as favorable press coverage, scapegoating Mr. Stephens and his former employer, and deflecting blame from ACS for an unrelated criminal incident involving the actions of several youthful offenders under the care of ACS.

27.    The KCDA Defendants' acts and omissions were likewise motivated by improper purposes, including gaining political favor and maintaining favorable inter-departmental relations with DOI.

28.    Moreover, a presumption of malice as to both the DOI and KCDA Defendants' acts and omissions arises from the absence of probable cause.

29.    As a direct and proximate result of Defendants' acts and omissions, Mr. Stephens was unlawfully arrested and detained, was accused of serious crimes, had his reputation irreparably damaged, and suffered the trauma and humiliation of those wrongs.

30.    This action seeks to hold Defendants accountable and obtain redress for their lawless conduct.

## JURISDICTION AND VENUE

31.    This action arises under 42 U.S.C. §§ 1983 and 1988, and under the laws of the State of New York.

32.    Jurisdiction lies in this Court under its federal question, civil rights, and supplemental jurisdiction, 28 U.S.C. §§ 1331, 1343, and 1367.

33.    Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiff's claims arose in the Eastern District of New York.

34.    Mr. Stephens has complied with the requirements of New York General Municipal Law ("GML") § 50-i by serving a notice of claim on the City of New York Office of the Comptroller on June 28, 2016.

## PARTIES

35.    Plaintiff Stanley Stephens is an individual residing in New York County, New York.

36. Defendant Andrew C. Brunsden is an individual residing in New York and was at all relevant times an employee of DOI.

37. Defendant Katerina V. Kurteva is an individual residing in New York and was at all relevant times an employee of DOI.

38. Defendant Peter Relyea is an individual residing in New York and was at all relevant times an employee of DOI.

39. Defendant Lesley A. Brovner is an individual residing in New York and was at all relevant times an employee of DOI.

40. Defendant Michael Carroll is an individual residing in New York and was at all relevant times an employee of DOI.

41. Defendant Susan T. Lambiase is an individual residing in New York and was at all relevant times an employee of DOI.

42. Defendant Mark G. Peters is an individual residing in New York and was at all relevant times an employee of DOI.  Mr. Peters serves as the Commissioner of DOI and holds final policymaking authority for DOI.

43. Defendant Shelley R. Solomon is an individual residing in New York and was at all relevant times an employee of DOI.

44. Defendant Michel P. Spanakos is an individual residing in New York and was at all relevant times an employee of KCDA.

45. Defendant Sara A. Walshe is an individual residing in New York and was at all relevant times an employee of KCDA.

46. Defendant City of New York is a municipality and a political subdivision of the State of New York, existing by virtue of the laws of the State of New York.  Defendant

City of New York is and was at all relevant times responsible for the policies, customs, and practices of DOI (for federal law purposes), and vicariously liable for the tortious acts and omissions of employees of DOI and KCDA committed within the course of their employment (for state law purposes).

47.     Defendants Brovner, Carroll, Lambiase, and Peters are referred to herein as the "DOI Supervisor Defendants."  They were high-level supervisors at DOI who supervised, directed, and approved the acts and omissions set forth in this Complaint, including Mr. Stephens' arrest, detention, and criminal charges.

48.     Defendants Brunsden, Kurteva, Relyea, and Solomon are referred to herein as the "DOI Investigator Defendants."  They were investigators at DOI who were tasked with the investigation of ACS and the entities it supervised in the "Close To Home" program and Mr. Stephens' arrest, detention, and criminal charges.

49.     The DOI Supervisor Defendants and DOI Investigator Defendants are referred to collectively herein as the "DOI Defendants."

50.     Defendants Walshe and Spanakos are referred to herein as the "KCDA Defendants."  They were the prosecutors responsible for the relevant investigation and Mr. Stephens' arrest and detention.

## GENERAL ALLEGATIONS

51.     Defendants participated in a ten-month investigation stemming from an incident in which three youthful offenders escaped from a group home facility in Brooklyn in the early morning hours of June 1, 2015 and committed horrific sexual and other violent felony offenses.

52.     The three youths were residents of the "Close To Home" program (also called the Non-Secure Placement, or "NSP," program), an initiative supervised by ACS, designed to place boys and girls who had been adjudicated as youthful offenders in structured placements close to their families and communities.  At the time, the three youths lived in a residence run by a private, non-profit organization engaged by ACS to help administer the "Close To Home" program.

53.     As of June 1, 2015, Mr. Stephens was employed by that same non-profit organization.

54.     Mr. Stephens was not assigned to the residence in which the three youths lived, nor was he present when the three youths escaped.

55.     Mr. Stephens worked for the non-profit organization, from January 2016 through June 2016, as an "Overnight Program Staff" member.

56.     Mr. Stephens' chief responsibilities were to monitor the youth overnight to ensure their safety and security.

57.     Mr. Stephens did his job well and made a positive difference in the lives of many of the youth with whom he worked.

58.     No one ever escaped while Mr. Stephens was on duty.

**Log Books**

59.     One responsibility of the Overnight Program Staff was to maintain a "Log Book" documenting the status of the youth at half-hour intervals throughout the night.

60.     Under ACS' contract with Mr. Stephens' former employer, ACS maintained the right to visit the NSP homes and inspect the Log Books after providing reasonable notice.

61.     There was no requirement that Log Books be filed with, registered or recorded in, or otherwise become a part of the records of ACS or any other public office or public servant.

62.     Neither Mr. Stephens nor his former employer ever offered or presented any Log Book to ACS or any other public office or public servant with the knowledge or belief that it would be filed with, registered or recorded in or otherwise become a part of the records of ACS or any other public office or public servant.

63.     At no time did Defendants know of any evidence that Mr. Stephens offered or presented any Log Book to ACS or any other public office or public servant.

64.     At no time did Defendants know of any evidence that Mr. Stephens had the knowledge or belief that any Log Book in which he made entries would be filed with, registered or recorded in or otherwise become a part of the records of ACS or any other public office or public servant.

65.     At no time did Defendants know of any evidence that ACS ever inspected any Log Book in which Mr. Stephens made an entry.

**Bed-Check Sheets**

66.     Mr. Stephens' former employer also created a document called a "Bed Check-Sheet," which was intended to document the "bed checks" (*i.e.*, the process of accounting for the youth at regular intervals) performed by Overnight Program Staff.

Bed-Check Sheet

Facility: _____

Date: _____

Staff on Shift:

1. _____  2. _____  3. _____

| KEY: AWOL-19 Home-22 Police-121 Hospital-27 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Youth Name: | | | | | | | |
| 11:00 PM | | | | | | | |
| 11:15 PM | | | | | | | |
| 11:30 PM | | | | | | | |
| 11:45 PM | | | | | | | |
| 12:00 AM | | | | | | | |
| 12:15 AM | | | | | | | |
| 12:30 AM | | | | | | | |
| 12:45 AM | | | | | | | |
| 01:00 AM | | | | | | | |
| 01:15 AM | | | | | | | |

67.     Unlike the Log Books, which were intended to document the status of the youth, the Bed-Check Sheets were intended to document the staff's bed check activity.

68.     Defendants have never known of any evidence that Mr. Stephens made a false or inaccurate entry on any Bed Check-Sheet, nor has DOI ever made such an allegation.

**The May 17, 2015 Overnight Shift**

69.     The arrest charges against Mr. Stephens were based on events that occurred on three dates: May 17, 22, and 23, 2015.

70.     From the evening of May 16 through the morning of May 17, 2015, Mr. Stephens worked an overnight shift at the NSP facility located at 240 St. Johns Place in Brooklyn (the "St. Johns Home"), where four boys were staying.

71.     Around 11:30 p.m., the boys were getting ready for bed.  By around 12:00 a.m., the boys were in their rooms.  By around 2:00 a.m., the boys were asleep.

72.     During his shift, Mr. Stephens made entries in the Log Book documenting the status of the youth at 30-minute intervals.  At 2:00 a.m., Mr. Stephens' entry in the Log Book said: "④ YOUTH IN ROOMS, ASLEEP."  From 2:30 a.m. to 9:30 a.m., each of Mr. Stephens' entries in the Log Book said: "④ STATUS REMAINS."



73.     The information reported in the Log Book was true and accurate.

74.     At the times noted in the Log Book entries, the four boys in the St. Johns Home were, in fact, asleep in their rooms.

75.     At no time did Defendants know of any evidence to the contrary.

**The May 22, 2015 Overnight Shift**

76.     From the evening of May 21 through the morning of May 22, 2015, Mr. Stephens worked an overnight shift at the St. Johns Home, where four boys were staying.

77.     Around 11:30 p.m., the boys were in bed.

78.     During his shift, Mr. Stephens made entries in the Log Book documenting the status of the youth at 30-minute intervals.  From 1:00 a.m. through 7:00 a.m., each of those entries said: "☺ STATUS REMAINS."  The preceding Log Book entry said: "☺ YOUTH IN BED ALL IS WELL."



79.     The information reported in the Log Book was true and accurate.

80.     At the times noted in the Log Book entries, the four boys in the St. Johns Home were, in fact, in bed and well.

81.     At no time did Defendants know of any evidence to the contrary.

**The May 23, 2015 Overnight Shift**

82.     From the evening of May 22 through the morning of May 23, 2015, Mr. Stephens worked an overnight shift at the St. Johns Home, where four boys were staying.

83.     By around 11:30 p.m., the boys were in their rooms.  By around 1:00 a.m., the boys were asleep.

84.     During his shift, Mr. Stephens made entries in the Log Book documenting the status of the youth at 30-minute intervals.  From 3:30 a.m. through 7:00 a.m., each of those entries said: "④ STATUS REMAINS."  The preceding Log Book entry said: "④ YOUTHS IN ROOM, ASLEEP."



85.     The information reported in the Log Book was true and accurate.

86.     At the times noted in the Log Book entries, the four boys in the St. Johns Home were, in fact, asleep in their rooms.

87.     At no time did Defendants know of any evidence to the contrary.

**The DOI Investigation**

88.     In the early morning hours of June 1, 2015, three boys staying at the NSP facility located at 289 Sixth Avenue in Brooklyn (the "Sixth Avenue Home") escaped during the night and traveled to Manhattan, where they committed horrendous violent and sexual crimes. All three boys have since been convicted for those crimes.

89.     During the ensuing investigation, it soon became apparent that the two Overnight Program Staff members responsible for monitoring the boys at the Sixth Avenue home on the night of the escape had not been monitoring them.

90.     When DOI investigators reviewed the Log Book from the Sixth Avenue Home, they discovered that the Overnight Program Staff member who made entries in the Log Book falsely wrote that the boys were asleep in their rooms, which they were not.

91.     DOI investigators arrested that former Overnight Program Staff member and charged him with Offering a False Instrument for Filing in the First Degree and Falsifying Business Records in the Second Degree.

92.     The incident had nothing to do with Mr. Stephens.

93.     After the arrest, DOI broadened its investigation to examine the policies and practices of ACS, Mr. Stephens' former employer, and organizations participating in the NSP program.  That investigation lasted from June 2015 through April 2016, when DOI issued a 23-page report entitled: "Investigation into the Close to Home Program and the Inadequate

Oversight by the City Administration for Children's Services" (*available at*

*http://bit.do/DOIreport*) (the "DOI Report").

94.     The DOI Report included findings and recommendations concerning

ACS' supervision of the "Close to Home" (NSP) program and the monitoring policies and

practices of Mr. Stephens' former employer and other organizations that contracted with ACS to

administer the "Close to Home" program.

### The False Arrest of Mr. Stephens

95.     As their investigation drew to a close, the DOI Defendants decided they

wanted to do more than just issue a report: they wanted to flex their law enforcement muscle by

making arrests.

96.     The DOI Defendants decided to charge and arrest four young

African-Americans, including Mr. Stephens.

97.     The DOI Defendants conferred with the KCDA Defendants, who

approved, encouraged, and agreed to provide assistance for the arrests.

98.     At all relevant times, the DOI and KCDA Defendants knew or were

reckless as (and/or deliberately indifferent) to the fact that probable cause for Mr. Stephens'

arrest did not exist.

99.     Before Mr. Stephens was arrested, the KCDA Defendants decided that the

charges would be dismissed soon after they were filed.

100.    That was good enough for the DOI Defendants, who would still get to tout

the arrests as evidence that they had taken strong action in response to the obvious lapses of

supervision in the "Close To Home" program.

101.    The DOI Defendants hoped the arrests would quell the public outcry over the horrific crimes carried out by the escaped youth.

102.    In or about April 2016, the DOI and KCDA Defendants agreed that Mr. Stephens and three other individuals would be arrested, detained, and accused of false business record crimes.  Together they formed a plan that the KCDA Investigator Defendants would handle the arrest and detention of Mr. Stephens.

103.    Defendants Brovner, Brunsden, Carroll, Lambiase, Peters, Solomon, Spanakos, and Walshe, through their words and actions, directed, requested, invited and/or encouraged the false arrest of Mr. Stephens.

104.    On or about April 12, 2016, Defendant Kurteva signed a criminal complaint accusing Mr. Stephens of three counts each of Offering a False Instrument for Filing in the Second Degree and Falsifying Business Records in the Second Degree.

105.    Ms. Kurteva's complaint alleged that Mr. Stephens made false Log Book entries from 2:00 to 9:30 a.m. on May 17, 2015; from 1:00 to 7:00 a.m. on May 22, 2015; and from 3:30 to 7:00 a.m. on May 23, 2015.

106.    On April 13, 2016, Defendants Kurteva, Relyea, and others arrested Mr. Stephens outside the KCDA's Offices at 350 Jay Street in Brooklyn.

107.    Defendants Kurteva, Relyea, and others caused Mr. Stephens to be handcuffed and held in various jail cells for hours.

108.    Defendants Kurteva, Relyea, and others caused Mr. Stephens to be fingerprinted, photographed, and moved to the Kings County Criminal Court Building for arraignment.

109.   That same day, the DOI Defendants issued a press release (*available at http://bit.do/DOIreport*) (the "DOI Press Release") announcing the arrests and the issuance of the DOI Report.

110.   The headline was "DOI ARRESTS THREE ADDITIONAL STAFFERS AT CITY'S JUVENILE HOMES AMID INVESTIGATION OF INADEQUATE OVERSIGHT BY THE CITY ADMINISTRATION FOR CHILDREN'S SERVICES."

111.   The opening paragraph of the DOI Press Release heralded the arrests, immediately followed by a reference to the June 1, 2015 incident during which three boys escaped from the Sixth Avenue Home and committed sex crimes and other violent felonies.  The DOI Press Release falsely implied a connection between those events.  It was not until the tenth paragraph that the Press Release noted that DOI had "also arrested" the staff member responsible for the boys' escape from the Sixth Avenue Home a year earlier.

112.   The DOI Defendants took steps to publicize the arrests, the DOI Press Release, and the DOI Report; including by directing their press liaisons to contact news organizations and encourage them to publish stories about the arrests.

113.   As a result, the arrests received widespread publicity, including in The New York Times, ABC News, CBS News, The New York Post, The New York Daily News, ProPublica, New York One, New York Nonprofit Media, DNAInfo, Philanthropy New York, Twitter, Facebook, and numerous other regional, national, and international news and media outlets.

114.   Mr. Stephens, an upstanding, hard-working, honest, and compassionate young man who had no prior history with the criminal justice system, had his reputation irreparably damaged as a result.

115. As a result of the arrest, Mr. Stephens was not allowed to work with kids and lost numerous jobs.

116. On June 2, 2016, the case against Mr. Stephens was unconditionally adjourned in contemplation of dismissal.  All charges were dismissed on December 1, 2016.

**Damages**

117. As a direct and proximate result of Defendants' acts and omissions, Mr. Stephens was deprived of his liberty by being arrested, handcuffed, detained in a jail cell, and restricted in his movement.

118. As a direct and proximate result of Defendants' acts and omissions, Mr. Stephens was subjected to the stigma and humiliation of being arrested and accused of numerous crimes in the absence of probable cause.

119. As a direct and proximate result of Defendants' acts and omissions, Mr. Stephens experienced substantial mental, emotional, and psychological distress and harm.

120. As a direct and proximate result of Defendants' acts and omissions, Mr. Stephens lost employment and income.

121. As a direct and proximate result of Defendants' acts and omissions, Mr. Stephens suffered irreparable damage to his reputation and earning capacity.

**FIRST CAUSE OF ACTION**

**42 U.S.C. § 1983, Fourth and Fourteenth Amendments to the United States Constitution**

*Against All Defendants*

122.    Mr. Stephens repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

123.    Defendants, individually and in concert, and acting under color of state law, deprived Mr. Stephens of his rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable search and seizure, and to his liberty, by arresting, confining, causing the confinement, and/or continuing the confinement of Mr. Stephens without any privilege.

124.    Defendants, at all relevant times, knew of, recklessly disregarded, and/or were deliberately indifferent to the absence of probable cause for their arrest and detention of Mr. Stephens.

125.    Defendants Brovner, Brunsden, Carroll, Lambiase, Solomon, Spanakos, and Walshe, through their words and actions, directed, requested, invited and/or encouraged the false arrest of Mr. Stephens.

126.    Defendants Kurteva, Relyea, and others carried out the false arrest of Mr. Stephens.

127.    Each of the DOI and KCDA Defendants was aware that there was no probable cause for Mr. Stephens' arrest, had an opportunity to prevent the false arrest, had a duty to intervene and prevent the false arrest, and failed to intervene and prevent the false arrest.

128.    Defendant City of New York is liable for the false arrest of Mr. Stephens because Defendant Peters, as the Commissioner and final policymaker for DOI, an agency of the

City of New York, personally approved, directed, requested, invited, and/or encouraged the false arrest.

129.    Mr. Stephens was conscious of his confinement and did not consent to it.

130.    Defendants deprived Mr. Stephens of his rights intentionally, knowingly, willfully, and/or recklessly.

131.    As a direct and proximate result of this unlawful conduct, Mr. Stephens sustained the damages alleged herein.

## SECOND CAUSE OF ACTION

### False Arrest (New York State Law)

#### *Against All Defendants*

132.    Mr. Stephens repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

133.    The DOI and KCDA Defendants, individually and in concert, arrested, confined, caused the confinement, and/or continued the confinement of Mr. Stephens without any privilege.

134.    Mr. Stephens was conscious of his confinement and did not consent to it.

135.    Defendant City of New York is liable for the tortious acts and omissions of the DOI and KCDA Defendants under the doctrine of *respondeat superior*.

136.    As a direct and proximate result of this unlawful conduct, Mr. Stephens sustained the damages alleged herein.

### THIRD CAUSE OF ACTION

### Defamation (New York State Law)

*Against Defendants Brunsden, Brovner, Carroll, Lambiase, Peters, City of New York, and Solomon*

137.    Mr. Stephens repeats and realleges the foregoing paragraphs and incorporates them by reference as if fully set forth herein.

138.    Defendants Brunsden, Brovner, Carroll, Lambiase, Peters, and Solomon (the "Defamation Defendants") jointly created and approved the DOI Press Release and DOI Report.

139.    The DOI Press Release falsely stated that three people, including Mr. Stephens, "were arrested on charges of falsifying log book entries *claiming they conducted required bed checks to ensure youth were secure in their bedrooms when they had not actually monitored the youths' whereabouts*."  DOI Press Release at 1 (emphasis added).

140.    To the contrary, neither the charging documents nor any allegation presented in the criminal proceedings alleged that Mr. Stephens made any claim concerning "bed checks," let alone a false one.

141.    The DOI Press Release falsely stated that "STANLEY STEPHENS [was] charged … with falsifying log book entries *that inaccurately indicated [he] checked the whereabouts of the juveniles*…"  DOI Press Release at 2 (emphasis added).

142.    To the contrary, neither the charging documents nor any allegation presented in the criminal proceedings alleged that Mr. Stephens "indicated" that he "checked the whereabouts of the juveniles," let alone that he did so "inaccurately."

143.    The DOI Report falsely stated that the agency "found" that Mr. Stephens and others "falsified log books by making entries *that purported to show they checked on the youth when, in fact, they failed to do so*."  DOI Report at 2 (emphasis added).

144.     To the contrary, as the Defamation Defendants were aware, Mr. Stephens did not purport to record information concerning *his own* activity (bed checks or otherwise) in the Log Book entries to which DOI referred.  Log Books were used to document the condition and activity of the *youth*, not staff members.  As the Defamation Defendants were aware, Mr. Stephens' former employer created a separate document – the Bed Check-Sheet – to record information concerning the staff's performance of bed checks.  During its investigation, DOI subpoenaed, obtained, and reviewed Bed Check-Sheets from Mr. Stephens' former employer. DOI has never alleged that Mr. Stephens placed false or inaccurate information in any Bed Check-Sheet.

145.     The DOI Report falsely stated that Mr. Stephens and others "Falsified Log Books."  DOI Report at 5.

146.     To the contrary, there was no false statement in the Log Book entries to which DOI referred.

147.     The DOI Report falsely stated that Mr. Stephens and others "falsified the log books by recording purportedly contemporaneous but blatantly false 'observations' of the youths when, in fact, the video showed that employees were not checking on the youths at the required intervals and were not filling out the log books in real time."  DOI Report at 5-6.

148.     To the contrary, there was neither a false statement nor any reference to "observations" in the Log Book entries to which DOI referred.

149.     The DOI Report falsely stated: (a) that "Stanley Stephens … Falsified Log Book Entries," (b) that Mr. Stephens "falsified the log book," (c) that Mr. Stephens was responsible for "falsification of the logbooks," and (d) that Mr. "Stephens recorded in the log

book that he had checked the whereabouts of the teens every half hour during that time period…" DOI Report at 7-8.

150. To the contrary, there was neither a false statement nor any statement about "check[ing] the whereabouts of the teens" in the Log Book entries to which DOI referred.

151. The Defamation Defendants published the foregoing false statements to numerous third parties, including the press, who widely disseminated the Defamation Defendants' false allegations.

152. The Defamation Defendants' false allegations constitute defamation *per se* because they accused Mr. Stephens of serious crimes, including felonies and misdemeanors under Article 175 of the New York State Penal Law.

153. The Defamation Defendants' false statements have damaged Mr. Stephens' reputation, caused him to lose employment and income, permanently harmed his earning capacity, and caused the other damages described in the foregoing paragraphs.

154. Defendant City of New York is liable for the tortious acts and omissions of the Defamation Defendants under the doctrine of *respondeat superior*.

WHEREFORE, Plaintiff Stanley Stephens demands judgment against the

above-captioned Defendants as follows:

a.    For compensatory damages, jointly and severally, in an amount to be determined at trial, but in no event less than five hundred thousand dollars;

b.    For punitive damages, jointly and severally, in an amount to be determined at trial;

c.    For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. §1988 and other applicable laws;

d.    For pre- and post-judgment interest as allowed by law; and

e.    For such other relief as this Court deems just and proper.

Dated: March 1, 2017
    New York, New York       DAVID B. SHANIES LAW OFFICE

By: _David W. Shanies_

David B. Shanies
411 Lafayette Street, Sixth Floor
New York, New York 10003
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com

*Counsel for Plaintiff Stanley Stephens*